**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| | : | |
| EDELMIRO PEREZ-GARCIA, JR., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 18-3783 |
| v. | : | |
| | : | |
| STATE FARM MUTUAL AUTOMOBILE | : | |
| INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

_____:

Henry S. Perkin, M.J.                                    January 13, 2021

## MEMORANDUM

Before the Court is the Motion for Partial Summary Judgement filed by

Defendant, State Farm Mutual Automobile Insurance Company, seeking dismissal of the

bad faith claim (Count II) of Plaintiff's Complaint.  For the reasons that follow, the

motion will be granted.

## I.    FACTS

Plaintiff was involved in a motor vehicle accident on October 7, 2016, with

Domingo Gonzalez-Padilla in Reading, Pennsylvania. Mr. Gonzalez-Padilla, the

tortfeasor, possessed liability insurance in the amount of Fifteen Thousand Dollars

($15,000.00). As a direct and proximate result of this accident, Plaintiff sustained injuries

to his right knee and left ankle. At the time of the accident, Plaintiff was insured under a

policy of automobile insurance issued by Defendant that provided first party medical

payments coverage in the amount of Ten Thousand Dollars ($10,000.00) and

underinsured motorist coverage in the aggregate amount of One Hundred Thousand Dollars ($100,000.00).

On February 10, 2017, plaintiff's counsel wrote to Defendant advising of his representation of Plaintiff.  In the letter, counsel requested that Defendant send him copies of the payment log indicating medical benefits and wage benefits paid to date. Counsel also stated that he was unaware of limits of the tortfeasor's liability insurance, and requested that Defendant accept the letter as notice of a potential claim for underinsured ("UIM") motorist benefits. It was also requested that the adjuster assigned to the UIM claim contact him within thirty (30) days.  *See* Mot., Ex. 2.

On February 20, 2017, UIM claim specialist Brandon Strittmatter wrote to plaintiff's counsel acknowledging counsel's representation of the plaintiff and enclosing a certificate of coverage. Plaintiff's counsel received the letter. *See* Mot., Ex. 3.   On March 1, 2017, plaintiff's counsel wrote to State Farm requesting copies of certain forms pertaining to the plaintiff's policy. *See* Mot., Ex. 4.

On March 15, 2017, claim specialist Strittmatter wrote to counsel enclosing the underwriting documents requested, and Plaintiff's counsel received both the letter and requested documents. See Mot., Ex. 5.  On March 30, 2017, claim specialist Strittmatter wrote to Plaintiff's counsel advising, among other things, that Defendant had been unable to conclude the claim as the company awaited the demand package and supporting documentation to complete its evaluation. Defendant would continue processing the claim once it received the information.  Plaintiff's counsel received the March 30, 2017 letter.  *See* Mot., Ex. 6.

2

On March 31, 2017, Plaintiff's counsel wrote Defendant advising that the tortfeasor's carrier offered its policy limits of $15,000.00 to settle that claim. Counsel requested that State Farm provide consent to settle. Counsel also noted that the plaintiff's policy provides a total of $100,000 in UIM benefits, and that his client was diagnosed with a right torn meniscus, chondromalacia patella, and medial femoral condyle, chondromalacia. It was also noted that Plaintiff had undergone an arthroscopy of his right knee involving partial medial meniscectomy, chondroplasty medial femoral condyle and chondroplasty trochlea and the plaintiff was released to work. Counsel requested that Defendant assign an adjuster to handle the UIM claim.  No medical records were enclosed with the letter, and counsel did not mention any left ankle/foot injuries in the letter.  *See* Mot., Ex. 7.

On April 6, 2017, Brandon Strittmatter wrote to plaintiff's counsel advising that Defendant was granting the Plaintiff permission to settle the tortfeasor claim and Defendant was waiving its subrogation claim. Plaintiff's counsel received the April 6, 2017 letter.  *See* Mot., Ex. 8.

On May 8, 2017, Brandon Strittmatter wrote to counsel advising, among other things, that Defendant was unable to conclude the UIM claim as the company awaited the Plaintiff's demand package and supporting documentation to complete its evaluation. Defendant would continue processing the claim once it received the information. Plaintiff's counsel received the May 8, 2017 letter. *See* Mot., Ex. 9.

On June 20, 2017, plaintiff's counsel wrote to Defendant enclosing some medical records concerning the Plaintiff's knee treatment. Among other things, counsel noted that

Plaintiff continued to suffer from pain and restrictions, and that he continued to treat with Orthopaedic Associates of Reading. The letter does not mention any left ankle/foot injuries.  Counsel indicated that he was not requesting records from Orthopaedic Associates at that time, as he would request the records upon Plaintiff's discharged from Orthopaedic Associates' care. Counsel further stated that Defendant should "not consider this a demand letter at this time." *See* Mot., Ex. 10.

On August 17, 2017, claim specialist Jack Little wrote to counsel advising, among other things, that Defendant was unable to conclude the UIM claim as the company awaits the demand package and supporting documentation to complete its evaluation. Once the information is received, Defendant would continue processing the claim. Plaintiff's counsel received the August 17, 2017 letter. *See* Mot., Ex. 11.

On November 30, 2017, claim specialist David Mullen wrote to counsel advising, among other things, that Defendant was unable to conclude the claim as the company awaited the demand package and supporting documentation to complete its evaluation. Once the information is received, Defendant would continue processing the claim. Plaintiff's counsel received the November 30, 2017 letter. *See* Mot., Ex. 12.

On January 24, 2018, claim specialist David Mullen wrote to counsel advising, among other things, that the plaintiff's claim was pending receipt of requested documents or information. Specifically, it was indicated that supporting documents and medical records were needed for evaluation of the UIM injury claim. Plaintiff's counsel received the January 24, 2018 letter. *See* Mot., Ex. 13.

On March 9, 2018, claim specialist David Mullen wrote to counsel advising,

among other things, that the plaintiff's claim was pending the "demand for evaluation of this UIM claim." Plaintiff's counsel received the March 9, 2018 letter. *See* Mot., Ex. 14.

On April 25, 2018, claim specialist David Mullen wrote to counsel advising, among other things, that the plaintiff's claim was pending due to "demand pends for evaluation of this UIM injury claim." Plaintiff's counsel received the April 25, 2018 letter. *See* Mot., Ex. 15.

On June 7, 2018, plaintiff's counsel wrote to Defendant enclosing records concerning Plaintiff and demanding payment of the $100,000.00 UIM policy limits. In this correspondence, plaintiff's counsel indicates that the plaintiff injured his right knee in the accident. Plaintiff's counsel also alleged, for the first time, that "[r]ecords indicate that [Plaintiff] also had significant pain from the accident in his left ankle." Counsel also claimed that the "the left ankle injury was worsened by the amount of stress that was placed on the ankle due to the right knee injury and surgery…" and Plaintiff had a severe ankle injury, including a non-union of a navicular bone fracture, along with other injuries to the ankle. It was also alleged that the left ankle injury forced additional weight-bearing to be placed on the right leg, which then aggravated the injury to the right knee and tore additional meniscus in the right knee. "At this point in time, [Plaintiff] is suffering from a badly damaged ankle and a deteriorating right knee." Counsel also stated the Plaintiff was undergoing injections "to try to calm down the degenerative arthritis that he has in the knee, which has been worsened, not only as a result of the accident, but also through the strain put on the right knee due to the left ankle injury." Plaintiff's counsel further stated that, "[a]lthough Plaintiff is being treated with injections at this point in time, it is clear

5

that the right knee is badly damage[d], and that more likely than not, he will be needing knee replacement surgery." "He will probably also need additional ankle surgery in the future." Counsel closed the letter by stating that he was "demanding the $100,000 policy limit in this matter, which is more than justified in light of the severe injuries to the right knee and left ankle, and the continuing deterioration of the right knee and ankle." *See* Mot., Ex. 16.

Plaintiff's counsel did not provide any medical records to Defendant from June 20, 2017 to June 7, 2018.  Plaintiff's counsel also did not communicate with Defendant concerning the plaintiff's alleged injuries during that time period because Plaintiff was continuing to receive treatment for the injuries he sustained as a direct and proximate result of the motor vehicle accident.

Plaintiff's counsel did not mention that Plaintiff's ankle treatment was related to the accident before June 7, 2018. Prior to that date, plaintiff's counsel never alleged any injury to Plaintiff's ankle, but Plaintiff previously advised Melissa Collins, Defendant's adjuster for his first party benefits, of his ankle injuries and treatment in 2017. *See* Resp., Ex. A; Collins Dep., Bates Label 1360.  Plaintiff's treating doctor opined that Plaintiff's ankle injury was directly and proximately caused by the injuries sustained during the accident. *See* Resp., Ex. B.

On June 7, 2018, Defendant's team manager Linda Kushnerock (David Mullen's supervisor) instructed in the claim activity log that Mr. Mullen should "complete your evaluation, keeping the insured atty aware of status as well as any additional information you may need to complete same." *See* Mot., Ex. 17 at bates-stamp 1357.  On June 8,

2018 claim specialist David Mullen wrote to plaintiff's counsel acknowledging receipt of the demand package. Mr. Mullen also advised that he would review the demand package and contact counsel as soon as possible regarding settlement discussions. Plaintiff's counsel received the June 8, 2018 letter. *See* Mot., Ex. 18.

On July 3, 2018, claim specialist David Mullen completed an evaluation of the UIM claim. In so doing, Mr. Mullen estimated that the "high" end of the evaluation was in excess of the $100,000.00 UIM limits based on the injuries claimed to the plaintiff's knee and ankle. Thereafter, Mr. Mullen submitted a request for authority to team manager Linda Kushnerock for the limits of the UIM policy. *See* Resp., Ex. 17 at bates-stamp 1356.

On July 5, 2018, in response to the authority request, Ms. Kushnerock responded in the log that: "while it does appear there is an immediate complaint of right knee pain, there is no mention of ankle injury until later on.  I have [sic] having trouble understanding the mechanism of injury.  Was there an intervening cause?  The insured underwent surgery for the meniscus tear fairly quickly.  See if you can have a nurse reviewer take a look at the claim and once that is complete, let's discuss." *See* Mot., Ex. 17 at bates-stamp 1356.  Plaintiff contends that the Defendant did not question causation of Plaintiff's knee injury until Rebecca Foster-Myers' report. *See* Resp., Ex. C, p. 13 (July 29, 2020 Dep. Linda Kushnerock).   On July 6, 2018, claim specialist Mullen requested that a Specialist in Medical Resources ("SMR") review the claim. The SMR question to be addressed was: "This is a light impact loss with immediate knee complaint & a significant delay for the ankle. Attorney argues the ankle pain & condition developed

as a result of limping from the knee injury & gait issues." The "special instructions" for
the SMR were "Review of mech of injury for: 1) torn meniscus & 2) ankle injury related
to gait issues & limping from the aforementioned knee injury." *See* Mot., Ex. 17 at bates-
stamp 1356. Defendant's Claims Manual provides that an SMR is a "resource to assist
claim handlers with understanding medical information presented in the claim." "Their
review of medical information for a specific claim and their comments are part of the
continuous one-on-one training for claim handlers and not claim handling direction."
SMRs can assist claim handlers by providing assistance with understanding medical
information presented in the claim file. Examples include medical terminology;
mechanisms of injury and medical necessity; review of medical treatment and records;
and relationship between diagnosed injury and medical treatment. *See* Mot., Ex. 19.
"SMRs are not claim handlers and do not make claims decisions. They are a resource to
assist handlers with understanding medical information presented in the claim. SMRs do
not direct actions on the claim or make payment decisions." *Id.*

On July 6, 2018, claim specialist David Mullen spoke with plaintiff's counsel
concerning the claim. As set forth in the claim log, Mr. Mullen explained the "delay in
offer for causal arguments on [mechanism of injury] for knee and ankle injuries." The
activity log further indicates that plaintiff's counsel was "frustrated with reason for delay
& claims no [question] regarding causal issues for either surgical injury." *See* Mot., Ex.
17 at bates-stamp 1355.

On July 10, 2018, SMR Rebecca Foster-Myers set forth her review in the claim
activity log. In so doing, she noted that she "[r]eviewed filed and medical records at the

request of the claim handler … to clarify the mechanism of injury for {Plaintiff]'s meniscus tear and ankle injury." As for the plaintiff's right knee, Ms. Foster-Myers commented: According to the operative report of the right knee (11/16/16), [Plaintiff] had a tear of the medical meniscus.  Findings also included a full thickness tear of the cartilage in the area of the medial meniscus, grade 4 chondromalacia (on a scale of 1 to 5, with 5 involving bone rubbing on bone due to loss of cartilage) under the kneecap (patella) and medial femoral condyle (medial meniscus is located under this bone).  The report did not [specify] the grade of chondromalacia of the medial compartment.  The mechanism of injury for a traumatic meniscus tear is usually a twist of the knee on a planted foot.  Direct impact to the knee can possible lead to a meniscus tear.  There did not appear to be a mechanism of injury for twist of the knee on a planted foot in this MVA.  The operative report stated the meniscal tear was a complex tear.  Medical literature states that complex tears are associated with osteoarthritis.  The operative report and MRI appeared to reflect significant degeneration in the knee. *See* Mot., Ex. 17 at bates-stamp 1355.

Notwithstanding this conclusion, Ms. Foster-Myers admitted during her deposition that the x-ray taken of Plaintiff's knee following the accident did not indicate significant degenerative changes in Plaintiff's knee; Emergency room records indicate that Plaintiff sought treatment for pain in his knee within hours of the accident; an MRI taken in October 2016 showed arthritis/degeneration in Plaintiff's kneecap not in the medial aspect of the knee where Plaintiff's injury occurred; Plaintiff's operative report does not indicate medial compartment arthritis or degeneration nor "significant

osteoarthritis;" and an MRI of Plaintiff's knee taken more than a year after the motor vehicle accident notes that there was "very early" (not significant) osteoarthritis in Plaintiff's knee. *See* Resp., Ex. G at 42, 44, 46, 47-48, 48-49, 55-56, 61, 64-65, 69. Further, Ms. Foster-Myers admits that this "very early" osteoarthritis is the only condition referenced in the MRI which discusses degeneration of the medial aspect of the knee. *See* Resp., Ex. G at 55-56. Ms. Foster-Myers acknowledged that the MRI would have reflected that there was significant degeneration of the medial compartment of the knee if it existed. *Id.* at 52.

Ms. Foster-Myers also commented that "[d]ocumentation available to view does not appear to support a mechanism of injury for a medial meniscus tear as a result of the MVA." She also commented that "[d]ocumentation available to view is questionable whether an aggravation of a pre-existing condition occurred in this MVA; no prior records were available to review." *See* Mot., Ex. 17 at bates-stamp 1355.  She also made the following observations regarding the plaintiff's left ankle: The first documentation found regarding left ankle complaints was dated 5/31/17. The medical notes reported it seemed to be the result of gout (not a result of the MVA). Documentation available to view does not appear to support a mechanism of injury for a left ankle injury. *Id.* On July 12, 2018, claim specialist Mullen reviewed the medical summary and review performed by SMR Foster-Myers. He commented that it indicates the Plaintiff's injuries are not related to the loss. He also commented in the log to team manager Kushnerock that it appears that Plaintiff was duly compensated from the 3rd party carrier based on the impact and records review for the injuries presented. *Id.* at bates-stamp 1354.

On July 12, 2018, team manager Kushnerock responded to claim specialist Mullen and, after looking at the records and vehicle photographs, instructed: Dave, while I question the mechanism of injury as well, I still think we need to investigate further. Please contact the insured attorney. Explain that we would like to send out for SUO to try and get a better understanding of the injury and how it occurred. Let's see if we can resolve for our insured. We may also need to consider additional records. Please discuss with the insured attorney and advise. Thank you. *Id.*, Ex. 17 at bates-stamp 1354.

On July 13, 2018, Mr. Mullen called Plaintiff's counsel and left a message for him concerning UIM handling per the file note. The log entry indicated that State Farm would offer a SUO and request additional records. *Id*. at bates-stamp 1354.

On July 16, 2018, Mr. Mullen spoke with Attorney John Speicher and explained that it was State Farm's position that Plaintiff's injuries were "degenerative in nature with knee surgery." It was also indicated that Defendant's position, at this time, was that the foot injury and resulting surgery were not a result of compensating for the knee injury, but related to unrelated condition or some other repetitive stress injury. Mr. Mullen also indicated that State Farm would like to arrange a statement under oath and also inquired if there were any additional records. In response, plaintiff's counsel opined that suit may be filed and implied that State Farm may be acting in bad faith. Mr. Mullen replied that requesting a statement under oath was in the Plaintiff's interest and not in bad faith. Mr. Mullen never stated that State Farm was denying the claim and no letter was ever sent by State Farm indicating that the claim was being denied. *See* Mot., Ex. 17 at bates-stamp 1354.

11

On July 17, 2018, plaintiff's counsel sent Mr. Mullen an email enclosing records from Orthopaedic Associates of Reading. Counsel further stated that, notwithstanding the enclosed records, "you had more than enough information relating the torn meniscus to the accident." He further stated, "[i]n case these records alter your position, please call me." "Otherwise, I will wait to hear from the defense attorney to schedule the statement of our client and your insured." *See* Mot., Ex. 20.  Plaintiff's counsel did not reference the plaintiff's ankle injury/treatment in the email, and never asserted that State Farm had denied the claim. *Id.* On July 25, 2018, plaintiff's counsel sent an email to Mr. Mullen stating that "I have not heard from your counsel about setting up a time for a statement of Mr. Perez." *See* Mot., Ex. 21.  On July 27, 2018, plaintiff's counsel sent another email to Defendant referencing that Defendant paid its $10,000.00 first party medical payments coverage limits and also paid first party work loss benefits in the amount of $5,000.00. Counsel also stated that, "while we are waiting for your attorney to contact me to take my client's statement under oath, it is our intention to file suit against State Farm for its handling of the case on August 10, 2018, unless payment of the UIM limits are tendered by that time." *See* Mot., Ex. 22. On August 15, 2018, Defendant's counsel wrote to plaintiff's counsel confirming their earlier conversation and also confirming that the Plaintiff's statement under oath ("SUO") was scheduled for August 21, 2018. *See* Mot., Ex. 23.

Plaintiff's SUO was conducted by Defendant's counsel on August 21, 2018. *See* Mot. Ex. 37. In his statement, the plaintiff testified that he injured both his right knee and left ankle in the accident and that he had ongoing pain in both of these body parts. *Id.*,

pp.71, 100. Plaintiff testified that he would need additional surgery on his left ankle, and that he may also need to undergo knee replacement surgery in the future. *Id.* at 94-95, 97-98. He testified that during the motor vehicle accident he twisted his knee. *Id.* at 65. This is significant because Ms. Foster-Myers opined that Plaintiff's knee injury is normally caused by a twisting of the knee and if she thought Plaintiff twisted his knee during the accident, it would have been a factor in her report. *See Id.* at 65-66, 74.

Mr. Mullen admitted that he learned of the results of Plaintiff's SUO two (2) to three (3) weeks after the statement was taken, i.e. sometime in September 2018. *See* Resp., Ex. E at 27-28. He further acknowledged that after reviewing the transcript of the statement, he was aware that Plaintiff testified that his knee and ankle turned inward during the accident. *See* Resp., Ex. D at 84.

On September 4, 2018, the plaintiff filed the instant case in this Court. *See* Mot., Ex. 1. On September 10, 2018, plaintiff's counsel forwarded a copy of the Complaint via regular mail to Defendant's counsel and requested that he accept service of the Complaint. *See* Mot., Ex., 24. On September 25, 2018, Defense counsel, through American Legal Records, served Notices to Serve Subpoenas, as well as proposed subpoenas themselves, on plaintiff's counsel to obtain medical any and all medical records concerning Plaintiff from Commonwealth Orthopedics Integrated Medical Group, P.C.; Orthopedic Associates of Reading, Ltd; Premier Orthopedics; Reading Hospital Surgicenter at Spring Ridge; Reading Hospital – Tower Health and UGI Utilities (plaintiff's employer). The subpoenas also included a request to produce all films and/or radiological studies and reports. *See* Mot., Ex. 25. Plaintiff's counsel did not object to the

13

proposed subpoenas. On December 10, 2018, defense counsel's paralegal forwarded to plaintiff's counsel a CD of records (five providers) that were received pursuant to subpoena. *See* Mot., Ex. 26.

On January 4, 2019, Attorney Drakas, through American Legal Records, served a Notice to Serve Subpoenas, as well as proposed subpoena, on Attorney Speicher to obtain any and all medical records concerning Plaintiff from Penn State Health St. Joseph Exeter. *See* Mot., Ex. 27. Plaintiff's counsel did not object to the proposed subpoena.

On January 9, 2019, Attorney Drakas wrote to Attorney Speicher advising that on October 3, 2018, Attorney Speicher received via email an Authorization for Release of Records from Reading Hospital – Tower Health. Attorney Drakas indicated that there have been several follow-up emails since then; however, neither ALR nor his office received the signed Authorization form. Copies of the emails were enclosed with the letter, and counsel was requested to have Mr. Perez sign the Authorization and return it ASAP. *See* Mot., Ex. 28.  On January 18, 2019, Attorney Speicher wrote to Attorney Drakas and enclosed the executed Authorization to obtain records from Reading Hospital – Tower Health.  *See* Mot., Ex. 29.  On March 29, 2019, Attorney Drakas' paralegal forwarded to Attorney Speicher a CD of records received from Penn State Health and Reading Hospital – Tower Health. *See* Mot., Ex. 30.

On April 10, 2019, Attorney Drakas' paralegal wrote to Attorney Speicher confirming that State Farm scheduled an independent medical examination of Plaintiff on May 29, 2019. The examination was to be conducted by Marc Manzione, M.D., an orthopedic surgeon. The letter also confirmed that, per Plaintiff's request, transportation

14

to and from the examination was being arranged. *See* Mot., Ex. 31.

On June 14, 2019, Dr. Manzione issued his report following the May 29, 2019 independent medical evaluation of the plaintiff. In the report, Dr. Manzione summarized the results of his examination of the plaintiff and further reviewed the plaintiff's medical records and diagnostic studies. Among other things, Dr. Manzione commented that the plaintiff's right knee MRI scan performed on October 20, 2016 shows "mild lateral tilting/subluxation of the patella, advanced patellofemoral degenerative arthritis, moderate degenerative arthritis of the medial compartment and tear of the posterior horn of the medial meniscus." "There are no subchondral signal abnormalities to suggest an acute or sub-acute articular cartilage injury." He further opined that "the only pathology on this study which is attributable to the 10/7/16 accident is the medial meniscus tear." The physician also reviewed Plaintiff's course of treatment. Among other things, he noted that, on February 6, 2017, Dr. Mancuso noted that the plaintiff continued to improve. Dr. Mancuso also commented that the meniscus pathology had "settled down," but Plaintiff had arthritis in his knee. In addition, at a March 23, 2017 follow-up, Dr. Mancuso observed that the plaintiff's right knee was "feeling better." It was also noted that "unprovoked" left ankle pain, which was first mentioned on March 20, 2017, was likely due to gout. After examining the plaintiff and reviewing the records and multiple diagnostic studies, Dr. Manzione concluded that the accident resulted in a right knee sprain/strain. He further opined that the accident caused or substantially contributed to a tear of the posterior horn of the right medical meniscus. "These injuries were sustained in the present of patellofemoral and medial compartment degenerative arthritis."

15

Dr. Manzione also observed that Plaintiff recovered from the right knee sprain/strain. In addition, the November 16, 2016 surgery addressed all of the motor vehicle accident-related knee pathology. "Resection back to a stable rim was accomplished," and Plaintiff was released to full duty work in February 2017.

Dr. Manzione also confirmed that Plaintiff experiences ongoing right knee symptoms as the result of degenerative arthritis. Arthroscopic partial medial meniscectomy (such as the one performed on 11/16/16) will not have an impact on the natural course of pre-existing degenerative arthritis. It also does not predispose to a recurrent meniscus tear. The surgery performed by Dr. Stelmach on January 18, 2019, was necessitated by what Dr. Stelmach described as an "acute" tear and was unrelated to the accident. Dr. Manzione also advised that "[m]eniscus tears frequently develop as the result of degenerative disease." "Patients who are significantly overweight are particularly prone to develop symptomatic degenerative tears." Notably, Dr. Manzione pointed out in his report that the plaintiff underwent bariatric surgery on November 29, 2017.

Dr. Manzione also commented that the plaintiff's left ankle complaints were not related to the accident. In so doing, he remarked: In March 2017, the patient began to experience left ankle symptoms which were primarily the result of a medial talar osteochondral defect and talonavicular degenerative arthritis. This pathology predated the 10/7/16 accident and was completely unrelated to this accident. In fact, it is clear from clinical records that no significant left ankle or foot injury was sustained in this accident. It is also not reasonable to attribute the left ankle problems which surfaced in March of

2017 to the right knee injury sustained on 10/7/16. By March of 2017, there were not any

ongoing motor vehicle accident-related right knee problems which would cause or

substantially contribute to compensatory left ankle symptoms. The left ankle/foot surgery

performed on 2/19/18 was neither directly nor indirectly related to the 10/7/16 accident.

In summary, the physician concluded that "the current clinical findings to the

right knee and left ankle are unrelated to the 10/7/16 accident." "There are no ongoing

functional limitations or restrictions attributable to the orthopedic injuries sustained on

10/7/16." "Any future treatment which the patient might require for the right knee and

left ankle problems (including total knee replacement) would be unrelated to the 10/7/16

accident." *See* Mot., Ex. 32.

Dr. Manzione concluded, contrary to Ms. Foster-Myers' conclusion, that the

motor vehicle accident subject to this matter caused Plaintiff's right knee injuries, i.e. the

accident caused or substantially contributed to a tear of the posterior horn of the right

medical meniscus. Dr. Manzione admits that the injuries to the knee and the injuries to

the ankle can each reaggravate the other, but this only occurred after the first ankle

injury, not the first knee injury which would link all of Plaintiff's injuries to the accident.

Plaintiff's treating physician Dr. John P. Stelmach opined that the motor vehicle

accident subject to this matter caused Plaintiff's right knee injuries which necessitated

surgical procedures in November 2016 and January 18, 2019. Resp., Ex. P. Dr. Stelmach

further opined that "[i]t is not unusual to have a meniscus tear from an initial event which

would then lead to a second meniscus tear down the line." *See Id.* Moreover, Dr.

Stelmach concluded that Defendant's medical expert's report "would not necessarily be

consistent with [his] impressions of his knee injury. Visualizing his knee injury

intraoperatively for [himself], it does appear consistent with initial injury with

progression over time to his current situation. It is not uncommon. for this to progress as

stated above." *Id.* As it pertains to Plaintiff's total right knee replacement in January

2020; and fourth surgical procedure to clean-up his knee in September 2020, Dr.

Stelmach also opined that the motor vehicle accident related to this matter was a

substantial factor in bringing about the procedures. *See* Resp., Ex. Q; Dr. John P.

Stelmach's September 18, 2020 Narrative Report. In February 2018, Plaintiff had left

ankle arthroscopic surgery. On August 26, 2019, Plaintiff had a second left ankle

arthroscopic procedure. Plaintiff's treating physician Dr. Jason R. Miller opined as

follows:

> …the right knee injury that was causally related to the October 7, 2016
> MVA has aggravated Edelmira Perez-Garcia, Jr's left ankle. I have not
> been made aware of any prior medical records that demonstrate treatment
> of the left ankle prior to this MVA. I cannot determine if the accident itself
> caused the left ankle problem as no pain was noticed until 20 months
> following the incident and no imaging was performed in a timely manner.
> It is certainly reasonable to conclude that crutch walking, gait alteration
> from favoring the right knee and his ongoing contralateral right knee
> problems precipitated his left lower extremity issues. Compensatory
> orthopedic problems are well described in the literature and seen
> frequently in practice. At present, Mr. Perez requires removal of the
> ganglionic cyst in the left ankle and tarsal tunnel, decompression of the
> tibial nerve, repeat ankle arthroscopy and possible juvenile cartilage
> transplant with autogenous bone graft to the left talus. If post traumatic
> ankle arthritis develops in the left ankle, this may ultimately require total
> ankle replacement surgery.

*See* Resp., Ex. "B." Dr. Miller further opined that the motor vehicle accident related to

this matter was a substantial factor in causing Plaintiff to endure both surgical

procedures. *See Id.*; Ex. R.

18

The June 14, 2019 report of Dr. Manzione was forwarded to Attorney Speicher on June 21, 2019. Attorney Speicher received the report. *See* Mot., Ex. 34. On July 10, 2019, Attorney Drakas wrote to Attorney Speicher extending a settlement offer in the amount of Twenty-Seven Thousand Dollars ($27,000.00). When factoring the underlying credit, the offer represented a valuation of Forty-Two Thousand Dollars ($42,000.00). *See* Mot., Ex. 35.  On July 11, 2019, Attorney Speicher wrote to Attorney Drakas rejecting the settlement offer. Attorney Speicher did not offer a counter-demand, but stated that "[i]f State Farm is not in six figures, we have no intention of engaging in settlement discussions with you and your client." *See* Mot., Ex. 36.

On September 1, 2020, the deposition was taken of former first party medical payments claim specialist Melissa Collins. *See* Mot., Ex. 39. Ms. Collins was the person who primarily handled the plaintiff's claim. Among other things, Ms. Collins testified that she has never handled underinsured or uninsured motorist claims and is not familiar with the criteria used by representatives handling such claims. *Id.* at p. 91. She does not generally consult with UIM claim handlers and would not review their log entries. *Id.* at p. 91-92. Her determination to pay bills is independent of what the uninsured or underinsured motorist claims handlers are doing, as "It's two separate coverages." *Id.* at p. 92. The witness also confirmed that there was never a request by the first party Medical Payments Coverage department that Plaintiff undergo an independent medical examination. *Id.* She also never sent the file out for a film review or records review by an orthopedist or other specialist. *Id.* at 93. Moreover, a Specialist in Medical Resources was never requested to review the records by the Medical Payments Coverage department. *Id.*

She testified that on October 12, 2016, Plaintiff advised her that his "knee jolted" while applying the brake upon impact during the motor vehicle accident. *Id.* at 50. Indeed, during a conversation four (4) days later, Plaintiff further advised Ms. Collins that he "slammed on the brakes upon impact and felt a pop in his right knee." *Id.* at 66. Plaintiff also shared that he experienced significant pain in his ankle. *Id.* at 63-64. Defendant paid Plaintiff's first-party medical benefits in the amount of $10,000.00 and wage loss in the amount of $5,000.00. *Id.* at 68.

Ms. Foster-Myers, Mr. Mullen and Ms. Kushnerock did not review the first-party file despite having access to it. *See* Resp., Ex. G, p. 23; Ex. D, pp. 24-25, 72; Ex. F, p. 18.

## II.   **PROCEDURAL HISTORY**

Defendant moved for dismissal of the bad faith and Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UPTCPL") claims.  On March 15, 2019, Judge Leeson granted the motion to dismiss the UPTCPL claim in Count III and denied the motion to dismiss the bad faith claim in Count II.  Regarding the bad faith claim, Judge Leeson noted:

> "'[B]ad faith' on the part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent.'" *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997) (quoting *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. 1994), *appeal denied*, 659 A.2d 560 (Pa. 1995)). A plaintiff must show: "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." *Id.*

> Contrary to State Farm's suggestion, the bad faith claim is not based solely on the failure to pay underinsured benefits after having paid

first-party benefits. The Amended Complaint also alleges that State Farm had medical documentation establishing that Perez-Garcia's injuries were caused by the motor vehicle accident, but that State Farm, "without medical support" and without a proper investigation, substituted the judgment of its own claim adjuster, a non-medical reviewer, and determined that the injuries were not sustained in the accident. *See* Compl. ¶¶ 18-19, 31-33. At this stage of the proceedings, this is sufficient to state a bad faith claim. *See Scott v. Foremost Ins. Co.*, No. 15-3257, 2015 U.S. Dist. LEXIS 133698, at *6 (E.D. Pa. Sep. 30, 2015) (concluding that the plaintiffs' allegations that the insurer disputed the plaintiffs' estimate without providing a reasonable explanation and with conducting any investigation was sufficient to state a bad faith claim); *Giangreco v. United States Life Ins. Co.*, 168 F. Supp. 2d 417, 423 (E.D. Pa. 2001) (concluding that in light of the witness accounts, even a sober driver may have caused the accident, and a factfinder could reasonably conclude that the insurer, which "did little investigation other than to review the police and toxicology reports," may have acted in bad faith by denying the claim without conducting a reasonable investigation).

*See* ECF No. 10, pp. 3-4.  Upon consent of the parties, Judge Leeson ordered the case transferred for final disposition pursuant to Fed. R. Civ. P. 636 (c) on May 20, 2019.

## III.   STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving

party.  *Anderson*, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  *Id.* at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present specific facts showing that there is a genuine issue for trial and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 325).  The non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim.  *Celotex*, 477 U.S. at 322-323.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper.  *Id.* at 322; *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).  When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case."  *Jones v. Indiana Area Sch. Dist.*, 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting *Celotex*, 477 U.S. at 325). "[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

**IV.**   **DISCUSSION.**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Because this matter comes before the Court on diversity grounds, we must apply the state law of

the Commonwealth of Pennsylvania. *Insetta v. First Liberty Ins. Corp.*, No. CIV.A. 14-

1890, 2015 WL 1279479, at *3 (E.D. Pa. Mar. 20, 2015) (citing *Chamberlain v.*

*Giampapa,* 210 F.3d 154, 158 (3d Cir. 2000) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64,

78 (1938))).

      In Count II of the Complaint, Plaintiff alleges that State Farm is liable in bad faith

for:

    A.     Failing to effectuate prompt, fair and equitable payment of
Plaintiffs underinsured motorist claim when State Farm had the
responsibility to do so;

    B.     By employing tactics by which State Farm treated Plaintiff as an
adversary during the processing of this claim;

    C.     In compelling Plaintiff to institute this cause of action to recover
underinsured motorist benefits due under his policy of insurance
with State Farm;

    D.     Failing to honestly and objectively consider Plaintiffs medical
condition when it refused to pay underinsured motorist benefits;

    E.     Failing to objectively consider the documentary evidence provided
to it by Plaintiff pertaining to his medical bills and treatment and
the value of the injuries that Plaintiff sustained in relation to other
claims paid by State Farm for similar injuries and losses; and

    F.     In failing to fairly process Plaintiffs underinsured motorist claim in
direct contravention to the payment of first party benefits for
medical claims and work loss in this matter.

Plaintiff also alleges that Defendant failed to pay underinsured motorist benefits knowing

that the law of Pennsylvania requires payments for the losses sustained by Plaintiff and

Defendant has attempted, in bad faith, to delay a fair and full evaluation of Plaintiffs

underinsured motorist claim by failing to have the claim objectively reviewed by

independent and objective medical providers and, instead, has substituted judgment of

non-medical reviewers, such as claims adjusters, over the clear medical records and reports set forth in Plaintiff's submitted records. *Id.*

In response to the Defendant's instant motion, Plaintiff contends that a number of issues preclude summary judgment. First, the parties dispute that Mr. Mullen denied Plaintiff's claim based upon Ms. Foster-Myers' report. Mr. Mullen admitted he "continued" Defendant's evaluation after the report, citing a need to do his "due diligence and have a complete and thorough evaluation" despite the lack of degenerative changes in Plaintiff's medial meniscus. Plaintiff also contends that Mr. Mullen's claim note demonstrates that he denied Plaintiff's claim. In reliance on Ms. Foster-Myers' report, on July 16, 2018, Mr. Mullen advised counsel for Plaintiff that Defendant's "position" was that Plaintiff's injuries were not caused by the motor vehicle accident.

Mr. Mullen "offered" to counsel for Plaintiff to have Plaintiff submit additional medical records and/or submit to a statement under oath. As opposed to advising counsel that State Farm's investigation was continuing and/or incomplete, or that State Farm had not yet made a final/formal determination, Mr. Mullen expressed an affirmative position in regard to causation and communicated that State Farm had "a position" in regard to Plaintiff's claim. Plaintiff contends that this unequivocally amounts to a denial of the claim, reasoning that if Mr. Mullen were not denying the claim, no affirmative "position" would have or should have been conveyed to Plaintiff's counsel.

To further support this position, Plaintiff argues that Defendant ceased from sending 45-day letters to Plaintiff and/or his counsel as is customary in generally accepted insurance practices and in conformity with 31 Pa. Code § 146.6 (Standards for

24

prompt investigation of claims). Pursuant to Section 146.6 (Emphasis added): Every insurer shall complete investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be completed within the time. If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected.

Prior to the July 2018 communications which Plaintiff construes as a denial of his claim, Defendant sent Plaintiff and/or his counsel 45-day letters required by Section 146.6 explaining "the reason the claim investigation has not been completed." *See* Resp., Ex. O, Bates-Labels 499, 500, 504, 505, 506, 507, 508, 510, 511, and 513. Mr. Mullen confirmed that the 45-day letter is sent out every 45-days so long as a claim is open. *See* Resp., Ex. D, pp. 63, 65-66. If State Farm's investigation was continuing past July 2018, Plaintiff contends that State Farm should have continued to send the aforementioned 45-day letters.

Defendant notes that following the July 16 and 17 communications between Mr. Mullen and Plaintiff's counsel, Plaintiff's SUO was taken on August 21, 2018 and Plaintiff's counsel filed the instant lawsuit on September 4, 2018.  Defendant notes that the communication was then between State Farm's counsel and plaintiff's counsel. Plaintiff does not, and cannot, complain that he was unaware of the status of State Farm's investigation. Defense counsel subpoenaed the plaintiff's medical records (including diagnostic films), employment records, and ultimately arranged for the Plaintiff to undergo an independent medical examination by orthopedic surgeon, Marc Manzione,

M.D. The plaintiff was provided notice and copies of the subpoenas, as well as copies of the records obtained. In addition, Plaintiff and his counsel provided a signed authorization and coordinating/attending the medical examination. Defendant notes that the Federal Courts of Pennsylvania have held that failure to send 45-day letters is insufficient to establish a claim for bad faith. *See Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 596 (E.D. Pa. 1999), *aff'd*, 234 F.3d 1265 (3d Cir. 2000) (holding that the insurer's failure to send letters every forty-five days explaining why the claim had not yet been evaluated did not create a material issue of fact regarding bad faith); *Rowe v. Nationwide Ins. Co.*, 6 F. Supp. 3d 621, 635–36 (W.D. Pa. 2014) (even if insurer was negligent in failing to inform Plaintiffs of the progress of the investigation in the precise manner mandated by the regulations, such negligence does not constitute bad faith).

In further support that Mr. Mullen did not deny Plaintiff's claim in July 2018, Defendant notes that Ms. Kushnerock testified at her deposition on September 4, 2019 that Mr. Mullen works under Ms. Kushnerock, and he is required to follow instructions given to him by Ms. Kushnerock. Mot., Ex. 40 at 45. This includes the instructions given to him to recommend to Plaintiff's counsel that a SUO be taken. There was also no denial letter ever sent by Defendant.

Defendant also notes that Plaintiff's own questioning of State Farm's witnesses establishes that the investigation of the claim continued beyond the SUO. Specifically, the following exchange occurred between Attorney Speicher and Team Manager Kushnerock:

> [Question]: Do you know after the sworn statement – because am I correct
> that at that point the concern that Foster-Myers had of a twisting to cause

26

the torn meniscus, Mr. Perez testified that there was, in fact, twisting? Are you aware of anything else that you needed at that point to further evaluate the claim?

[Answer]: I mean, I think that it's, like you just said, a claim, so I think we needed to have everything taken into account, all of the claim. So I know he talked about his left ankle also. So I think we still needed more information. The claim was ongoing at that point.

[Q]: And where was this more information going to come from?

[A]: Well, I think we received some of the information from Mr. Perez-Garcia, but I do think also that sometimes when you do a get statement under oaths, that it can lead to more questions regarding the injuries themselves and whether you need an IME or a records review or things like that.

[Q]: At the time after the completion of the sworn statement, and I'll go back to what I had asked you previously, let's assume at that moment that you had questions relative to the ankle. You able to still evaluate the knee at that point independent of the ankle, are you not?

[A]: It's not regularly done that way. I mean, I guess, you know, it's – It's just not a simple case. There's ongoing issues, and we were continuing to investigate it, so I – I would say that no in that situation where he was claiming other injuries, I would say we would try to get a full value of the claim.

Mot., Ex. 41 at pp.18-19. Mr. Mullen confirmed the ongoing investigation in his

deposition of July 29, 2020, specifically:

[Question]: In this case, after the sworn statement was done on August 21, was the necessary investigation complete [in] Mr. Perez' case?

[Answer]: No.

[Q]: Why not?

[A]: We were still looking for other records, current and prior records, to review the evaluation.

Mot., Ex. 43, p. 35.  During the SUO, Plaintiff testified that he injured both his right and left knee in the 2016 accident, underwent surgery for both knees, was experiencing ongoing pain in both knees, and anticipated additional treatment/surgery for both knees. On May 29, 2019, Plaintiff underwent an independent medical examination by orthopedic surgeon Marc Manzione, M.D.  In his June 29, 2019 report, Dr. Manzione related only Plaintiff's initial right knee meniscus tear and arthroscopic surgery to the accident.  He opined that all of Plaintiff's other alleged injuries/treatment including his left ankle complaints were unrelated to the accident.  State Farm thereafter valued the case at $42,000 and, through counsel, offered $27,000 to settle the case with Plaintiff. Plaintiff rejected the settlement offer without a counter-demand.

Plaintiff contends that it is beyond dispute that Defendant denied Plaintiff's claim based upon Ms. Foster-Myers' "very flawed report" and her conclusion that Plaintiff's injuries were not related to the motor vehicle accident. Plaintiff characterizes her conclusion as "an intentional pursuit of a conclusion completely contrary to even a rudimentary understanding of Plaintiff's medical records." Plaintiff also contends that Defendant's alleged lack of good faith investigation into the facts and frivolous/ unfounded refusal to pay proceeds of the policy justifies a finding of bad faith.  Plaintiff further argues that the review performed by Ms. Foster-Myers demonstrates a bad faith effort by Defendant to "cherry-pick" small parts of Plaintiff's medical history in order to piece-together a picture favorable to Defendant's position. She alleges that Ms. Foster-Myers ignored operative facts in the record so that Defendant could attempt to justify drawing conclusions which directly conflict with the conclusions of Plaintiff's treating

doctors, that the 2016 motor vehicle accident caused Plaintiff to sustain injuries to both

his right knee and left ankle.

In order to establish a claim for bad faith, the insured has the burden of proving

his or her allegations by "clear and convincing evidence." P*olselli v. Nationwide Mutual*

*Fire Insurance Co.*, 126 F.3d 524, 528 (3d Cir. 1997).  Moreover,

> [t]o recover for bad faith, "a plaintiff must show by clear and convincing
> evidence that the insurer (1) did not have a reasonable basis for denying
> benefits under the policy and (2) knew or recklessly disregarded its lack of
> a reasonable basis in denying the claim." *Condio v. Erie Ins. Exch.,* 899
> A.2d 1136, 1143 (Pa.Super.Ct. 2006). "Thus, an insurer may defeat a
> claim of bad faith by showing that it had a reasonable basis for its
> actions." *Amica Mut. Ins. Co. v. Fogel,* 656 F.3d 167, 179 (3d Cir. 2011).
> "[T]he essence of a bad faith claim" is "the unreasonable and intentional
> (or reckless) denial of benefits." *UPMC Health Sys.,* 391 F.3d at 506.

*Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 522-23 (3d Cir. 2012).  The standard

"requires a showing by the plaintiff that the evidence is so clear, direct, weighty and

convincing as to enable a clear conviction, without hesitation, about whether or not the

defendant acted in bad faith." *Bostick v. ITT Hartford Grp., Inc.*, 56 F. Supp.2d 580, 587

(E.D. Pa. 1999). In addition, mere negligence or bad judgment on the part of the insurer

is insufficient to constitute bad faith. *See Terletsky,* 649 A.2d 488. It is well-settled that

"a reasonable basis is all that is needed to defeat a claim of bad faith." *Horowitz v. Fed.*

*Kemper Life Assurance Co.*, 57 F.3d 300, 307 (3d Cir. 1995).  Finally, "[e]ven

questionable conduct giving the appearance of bad faith is not sufficient to establish it so

long as the insurer had a reasonable basis to deny coverage." *Post*, 691 F.3d at 523.

Although the plaintiff disagrees with the conclusions of both Ms. Foster-Myers

and Dr. Manzione, it is clear that State Farm had a reasonable basis to value the claim

based, at a minimum, on Dr. Manzione's report. As stated in *Mann v. UNUM Life Ins. Co. of Am.*,

> The insurance company need not show that the process used to reach its conclusion was flawless or that its investigatory methods eliminated possibilities at odds with its conclusions. Rather, an insurance company simply must show that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action.

2003 WL 22917535 at *7 (E.D. Pa. Nov. 23, 2003).  Even if Defendant's claims-handling processes were not ideal, there is no evidence in the record, let alone clear and convincing evidence, to indicate that Defendant's purported mishandling of Plaintiff's claim was motivated by a dishonest purpose or ill will. *Post*, 691 F.3d at 525.  The Third Circuit Court of Appeals has advised that

> while under Pennsylvania law bad faith may extend to an insurer's investigation and other conduct in handling the claim, that conduct must "import a dishonest purpose." *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa.Super.Ct. 2004) (citation and internal quotation marks omitted). Invariably, this requires that the insurer lack a reasonable basis for denying coverage, as mere negligence or aggressive protection of an insurer's interests is not bad faith. *See Frog, Switch & Mfg.*, 193 F.3d at 751 n. 9 (explaining that "mere negligence or bad judgment does not constitute bad faith"); *O'Donnell*, 734 A.2d at 910 (explaining that an insurer may "aggressively investigate and protect its interests").

*Post*, 691 F.3d at 524.

Taking the evidence in a light most favorable to Plaintiff that Ms. Foster-Myers performed an insufficient and incorrect medical review of Plaintiff's case, Defendant did not deny Plaintiff's claim based upon that review, but rather continued its investigation of Plaintiff's claim.  Moreover, it is not apparent on the record that Defendant has ever denied coverage to Plaintiff.

Similarly, the fact that the plaintiff's experts relate all of the plaintiff's right knee and left ankle complaints to the accident does not provide a basis for bad faith. Defendant retained orthopedic surgeon, Marc Manzione, M.D., to perform an independent medical examination and records review. After completing same, Dr. Manzione concluded that that only the plaintiff's initial meniscal tear and resultant arthroscopic surgery were related to the accident. None of the plaintiff's left ankle complaints/treatments, or additional right knee treatment, was accident-related. Accordingly, State Farm had a reasonable basis for its claim handling.

For all of these reasons, Defendant's motion as to Plaintiff's bad faith claim at Count II of the Complaint will be granted.  An appropriate Order follows.